Joynes, J.
To entitle the defendant in error to re•cover in this case, it was incumbent on him to establish that his claim rests upon a “legal ground;” in -other words, that it could -be sustained upon principles •of law or equity. Code, ch. 45, § 12, ch. 46, §§ 1-3. The question before us is, therefore, a legal one purely; beyond that view of the case we cannot go. We have nothing to do with any consideration of justice, policy •or good faith, which might appeal to the Legislature, *406 if any such consideration exists, except so far as they ma7 bear on the legal question.
The claim in this case is for the price of leather and. fin¿[ingg furnished to the penitentiary from November,. 1861, to February, 1862, for the purpose of carrying on its manufactories. It is not disputed that they were-proper and necessary supplies. During that period 'the State of Virginia was one of the 'States associated under the name of the Confederate States. The government of Virginia, at Richmond, had the possession and control of the penitentiary, supplied it with materials, sold and appropriated the proceeds of the goods-manufactured there. Robert M. Nimmo was then acting as the general agent and storekeeper of the penitentiary, having been elected before the secession of the State, for a term of two years from January 1„ 1861; and having continued to hold the office and perform its duties after secession as before. It is the duty of the general agent, “on the requistion of the board”' of directors, to purchase all materials and other things, required for work done in the penitentiary. Code, ch-218, § 55. It does not appear in this case, by any express proof, that there was any requisition of the board for the purchase of the articles which are the subject, of this claim, nor that there was any general requisition that would cover such purchases, nor that the purchase of them was subsequently ratified by the board.. It does not even appear, by any express proof, that they were purchased by the general agent. The answer of the auditor, however, does not deny that they were purchased by Nimmo, acting as general agent, and on. the requisition of the board. And I think it may be fairly inferred, from all the evidence, that the purchases were made by Nimmo, as general agent, and. that they were made on a requisition of the board given beforehand, or were ratified afterwards; which would have the same effect as a previous requisition- *407 The question is, whether the purchases, so made, impose a legal claim upon the Commonwealth, which can he sustained by the court.
It must be conceded, that Chalkley, when he sold these goods, looked to the Richmond State government, and to that alone, for payment. He must he presumed to have known of the existence of that government ; that it was exercising supreme and exclusive control in this' part of the State; that it had exclusive management and control of the penitentiary, furnished its supplies and appropriated its work; and that Himmo, however and whenever he was appointed general agent, was then acting as such under the authority, direction and control of that government; in short, that he was acting as an officer of that government. It may fairly he inferred, that Chalkley recognized that government as a lawful government, because it appears that he was, what the witness calls, “ a good Southern man.” He, no doubt, believed that that government would survive the efforts to overthrow it. Why, then, should he not he willing to sell goods to it upon its credit alone ? That he sold the goods on the credit of that government alone, further appears from the fact that he was willing to accept Confederate money in payment in 1865, when it had depreciated to not more than one-twentieth, or perhaps one-fortieth, of its value, at the time he was entitled to receive it, under his contract. That he reposed confidence in the credit of that government, or in its ability .to hind the State by its contract, is shown by the fact that he continued to sell to it as before, notwithstanding the non-payment of the present claim, and from the other fact that he sold to the penitentiary cheaper than to other manufacturers, because he “ considered the State (meaning, of course, as it might he hound by the Richmond government) safer than individual credit.”
We must now enquire what that government was, *408 and what was its legal relation to the people of the State—to the State itself.
I shall not go into a discussion of the right of a State ^ gece(je from the Union in 1860 and 1861, or of the effects resulting from its exercise, or attempted exercise. It was understood, in the States which seceded, to he nothing more than a withdrawal from all connection with the other States, under the constitution; not the creation of a new State; the original State retaining its integrity and identity. In Virginia, the officers of government continued; there were no new elections in consequence of secession. In June, 1861, the “ restored government,” as it was called, was established' at Wheeling, and claiméd jurisdiction, as did the Bichmond government, over the whole territory of the State. After the establishment of the restored government, each of these conflicting governments became unable to render its jurisdiction practical and effectual, as to a large part of the territory of the State. The actual jurisdiction became practically divided between them—the Bichmond government exercising exclusive jurisdiction over about two-thirds of the State, and the restored government exercising jurisdiction over the other third.
I need not follow up the history of these conflicting governments, or discuss their respective claims, upon jirineiples of public and constitutional law, to be considered the true and lawful government of the State. It has been held by the Supreme court, that when there are two governments in a State, each claiming to be the lawful government, the question which of them is really the lawful one, is not a judicial question, but a political one, to be determined by the political authorities of the United States. Luther v. Borden, 7 How. U. S. R. 1.
How, whatever opinion we, or any other citizen, may entertain upon the respective claims of these two gov *409 •ernments, upon principles of law, of reason or justice, nil must agree that the opinion of the authorities of the United States has been unmistakably expressed. The conqueror, as might have been expected, has resolved the question in favor of his ally in the conflict, and ■against his enemy. This question was fully discussed by Chief Justice Chase in Cæsar Griffin’s case, 8 Am. Law Register, N. S., 358; and he accordingly held that the restored government was the lawful government of Virginia.
The present constitution of the State recognizes the restored government as having been the lawful government, and denounces the authorities which carried on a government at Richmond during the war as “ usurped and pretended authorities.” This constitution was ■adopted by the people at the polls. "Whether the people adopted it willingly and because they approved it, or only adopted it as the best alternative within their reach, is a matter of no consequence—the constitution is equally obligatory in either case. Sitting here under the authority of that constitution, and exercising only the jurisdiction it confers upon us, directly or indirectly, we are not at liberty to disregard its provisions, •or the principles on which it evidently rests. Whatever we might have thought about it, as an original question, if it was our province to decide it as such, we are not at liberty now, in the circumstances in which we are placed, to hold judicially, in opposition to the constitution, that to have been the lawful government which the constitution has declared to have been unlawful. The most that would he conceded by the [Federal authorities, and the most that can be maintained upon the principles of the present constitution, is, that the Richmond government was a de facto gov■ernment. That is all that the Supreme court has conceded to the governments of seceded States, which had •complete and exclusive control of the whole territory, *410 with no other government asserting a conflicting claim. Texas v. White, 7 Wall. U. S. R. 700; Thorington v. Smith, 8 Ib. 1.
The constitution of the State provides that “no appropriation shall ever be made for the payment of any debt or obligation created in the name of the State of Virginia, by the usurped and pretended authorities assembled at Eichmond during the late war.” This provision makes no reference to the character or consideration of the debt, further than to describe it as a debt, “created in the name of the State of Virginia, by the authorities at Eichmond.” The evident meaning is, that every such debt or obligation is void on principle,, independent of this provision, and that the Legislature-shall never treat any such debt or obligation as valid,, by providing for its payment. And the convention seems to have treated such debts and obligations as invalid, because they considered the Eichmond government as having no lawful authority to bind the State-by any contract. This provision of the constitution, though in terms a restraint upon the Legislature only,, is virtually a restraint upon the courts likewise.
It was contended at the bar, that notwithstanding-the general and comprehensive terms of this provision, it could not have been designed to prohibit the payment of such a debt as that claimed in this case. The= support of the penitentiary, it was said, was imposed upon the State by laws passed long before secession,, and never repealed; and the restraint and punishment; of offenders were necessary to the protection of society. And reference was made at the bar, and in the opinion, of the Circuit court, to a report made by the majority of the committee for courts of justice, in the house of delegates of 1865-6, in reference to the right of the Legislature, under the constitutional provision above quoted, to provide for the payment of claims for bread and other necessary supplies for the inmates of the- *411 penitentiary during the war, and for which the claimants alleged that, after the exercise of due diligence, they had been unable to obtain payment from the Richmond authorities. I do not propose to express any opinion upon the soundness of the views presented in that report, or in the counter report of the minority; for the question then before the Legislature was not the same as that now before this court. The Legislature, if not restrained by the constitution, might choose to recognize an obligation founded on considerations of justice, policy, or good faith, when it might not think there was any obligation in 2ioint of law. This court, before it can sustain a claim rejected by the creditor, must find a ground of legal obligation. The majority of the committee held that the claims under its consideration, being founded on long-established laws, never repealed by the restored government, and essential to the preservation of civil society; being what they called debts of the people; not debts of the government; not arising originally out of the action of the “usurped” authorities, and not burdens thrown upon the people of the State in consequence of secession, over and above what they must have borne had there been no secession; but being such only as they must have borne under any circumstances, could not properly be regarded as debts or obligations “ created by the usurped authorities.” Upon that ground, among others, the majority of the committee expressed the opinion that the payment of these claims was not inhibited. But these views, if we should hold them to be sound, will not help us, unless we can hold that there is some ground of legal obligation upon the State.
Chalkley cannot sustain his claim upon the ground of his contract with the Richmond authorities, propria vigore, for we must hold that they had no right to make a contract that could, as such, impose a legal obligation *412 on the State. It is insisted, however, 1st, that there was no contract with the Richmond authorities, so called, but that the contract was made with Mmmo, an 0fgeer appointed by the lawful government, before secession, and never removed by the restored government; and 2d, that Challdey does not seek to recover on the basis of the express contract, if it should be held that it was made with the Richmond authorities, but upon an implied obligation, arising out of the duty of the State to maintain the penitentiary. Let us consider those grounds.
1. While it is true that Mmmo was appointed by the lawful government before secession, and while the counsel is probably right in saying that he was not removed from his office by force of any ordinance or statute of the restored government, I cannot hold that he is to be regarded as acting under the authority of the restored government, or as possessing any authority from that government, while he was daily acting in the service of the Richmond government, and recognizing its authority. The Richmond %overnment was hostile to the restored government. The two positions were, therefore, incompatible. When Mmmo recognized the authority of the Richmond government and continued in its service, he must be regarded as repudiating and turning his back upon the restored government. When he thus repudiated and turned his back upon the restored government, he abdicated his office under that government, if he was ever entitled to hold it under that government, and virtually resigned it. The suggestion that an officer of the Richmond government was, at the same time, an officer of the restored government, would have shocked the common understanding of that day; and any officer who would have asserted such a pretension would, without doubt,- have been thrust from' his office,' with the least possible ceremony.
*413 2. ChalHey must avail himself of the alleged obligation of the restored government to provide for the penitentiary, if at all, either on the principles applies • ble to the action of assumpsit upon what the laws call an implied contract, or on the equitable doctrine of substitution. The case was put by the Circuit court on both grounds. And first as to the principles of assumpsit.
I have already said that ChalHey made an express contract with the Richmond government, upon whose credit alone he relied, at that time, for the payment of his debt. The precise question to be now considered is, whether the law will imply another contract on the part of the restored government, or on the State represented by it, for the payment of this debt.
If this debt to ChalHey can be considered as a debt “ created ” by the Richmond government, within the meaning of the constitution, it might be contended, with great force, that the provision of the constitution referred to imposes a restraint upon the court as well as upon the Legislature, and that it would be an evasion of the constitution thus indirectly to give substantial effect to an invalid and reprobated contract. But I do not propose to consider these questions.
A conclusive reason why the law will not imply an assumpsit to pay ChalHey’s debt, by the State, or by the restored government, is, that the sales upon which his claim is based were made to the Richmond government, exclusively upon the credit of that government. The principles applicable to this case, putting it in the strongest light for ChalHey, may be illustrated by reference to the case of husband and wife. "When a wife is living with her husband, he is bound to provide her with necessaries, and a person who provides them for her may sue him for the price. So, if a husband turns his wife out "of his house, and refuses to provide for her, a person who supplies her with necessaries may *414 sue the husband for the price, upon an assumpsit implied from his obligation to provide for her. But if, in either case, the goods are not furnished upon the credit of the husband, but upon the credit of another person, the husband cannot be held liable. This is so when the goods are sold upon the credit of the wife only, and although she is living with her husband, and so he is undoubtedly bound to provide for her. The person who supplies the articles, may, if he chooses, rely upon the credit of the husband and the duty which the law casts upon him to provide for his wife, or, if he chooses, he may rely upon the agreement and the credit of some other person, whom he prefers to trust, even though that person be a married woman. "When he has fairly, and with a knowledge of the facts, chosen his debtor, the law will not allow him to change his contract. He cannot “ repudiate his choice and choose again.” Metcalf v. Shaw, 3 Camp. R. 22; Bentley v. Griffin, 5 Taunt. R. 356, (1 Bug. C. L. R. 131); Stammers v. Macomb, 2 Wend. R. 454. So if, at the time of a sale, the seller knows that the person with whom he is dealing is an agent, and that he is acting within the scope of his authority so as to bind his principal, and notwithstanding this knowledge, he chooses to make the agent his debtor, and looks to him alone for payment, he cannot, after the failure of the agent, turn round and charge the principal; having made his election when he had the power to choose between the one and the other. Addison v. Gandapeqin, 4 Taunt. R. 574; Paterson v. Gandapeqin, 15 East. R. 62; Paige v. Stone, 10 Metc. R. 160.
* How, as much as could be claimed in behalf of Chalkley, would be, that the obligation of-the State, represented by the restored government, to provide for the support of the penitentiary, should be placed upon as high ground as the obligation of a husband to support his wife; and that a person furnishing supplies *415 for the penitentiary should have the same rights as a person furnishing supplies for a wife. If that were conceded, it would not help Chalkley, because he did not • furnish the articles sold by him upon the credit of the State, or of her lawful representative, the restored government; but upon the credit of certain parties in Richmond, who did not lawfully represent the. State, and could not pledge her credit.
If Chalkley had found the penitentiary abandoned or neglected, and the necessary wants of the prisoners, unprovided for; and had, in that state of things, supplied them with food, clothing and other necessaries, relying upon the restored government alone to reimburse him, he would have had a claim of the strongest ■character upon the' justice and the gratitude of the ’present government. Perhaps his claim might have been sustained by the court in that case; but as to that I give no opinion. But that is not the case. Chalkley supplied neither food, clothing, fuel, or any other article of necessity for the prisoners. He supplied leather and findings to the Richmond government, upon its credit, to be used in carrying on its workshops in the penitentiary. It does not appear from anything in the cause, that the proceeds of the goods manufactured from these materials, or any part of such proceeds, went to the use of the penitentiary in any way, much less to the use of the prisoners, by supplying them with necessaries. They may have been part of the funds which were soon after sunk in the hands of Himmo.
It was argued, however, that the business of manufacturing in the penitentiary is part of the discipline of the prison, employed to promote the good behavior, the contentment, and the health of the prisoners. Does it follow that Chalkley, who supplied materials for carrying on one of the workshops, ought to be regarded as furnishing necessaries for the prisoners, in like man *416 ner as one who furnished bread? I think not. It may be true, and doubtless it is, that it is of great advantage to the prisoners, and to the discipline of the prison, ^]ia¿ ^ey should he kept at work; hut those advantages are incidental. The primary purpose in carrying on the workshops is to make money. The great object is to make the penitentiary support itself, and, if possible, yield a surplus to go into the general treasury. In some of the States these institutions yield large profits, over and above expenses. The Eichmond government was in deadly hostility to the restored government, in the pending war, and had, with its adherents and allies,, excluded the restored government from the greater-part of the territory over which it claimed jurisdiction, and from the control of the public institutions within those limits. All this, we are hound to presume, was well known to Chalkley. It would seem to he too clear for argument, that, under such circumstances, the State, or the restored government, was under no obligation to pay for supplies furnished by Chalkley to the Eichmond government to he worked up into goods for its benefit; to enable that government to carry on a profitable business, and thereby to augment its resources and lessen the burden of taxation. "Where there is no obligation, no duty, the law will not imply an assumpsit.
As to the claim to rest this case upon the ground of substitution, I need say hut little. The claim is, that Chalkley is entitled to he substituted to the rights of the prisoners, to he provided for by the State, as represented by the restored government. Certainly the Eichmond authorities had no claim against the State to which he could claim to he substituted; and no such claim has been asserted. "Whatever right of substitution to the prisoners a man might have who supplied their necessary wants, the claim could not he extended to articles not, in themselves, necessaries for the pri *417 soners, without proof that they or their proceeds were actually applied to the procurement of such necessar ries. As I have said heretofore, there is no proof that the articles furnished hy Chalkley, or any part of them, or their proceeds, went to the procurement of necessaries for the prisoners, or even that the proceeds of them went to the use of the penitentiary at all. Besides, as I have already shown, the articles famished by Chalkley were only materials to be worked up into goods, to be sold for the benefit of the Richmond government. Under the “circumstances then existing, there was no obligation, legal or equitable, upon the restored government to pay for things furnished to the Richmond government, to enable it to make money. It would be inequitable, in the last degree, to impose such an obligation. And a court of equity will not lend its aid to enforce payment, by its extraordinary remedies, of claims that are not sustained by justice and good conscience.
Moreover, it was incumbent on Chalkley, before he could claim relief upon the principles of equity, to show that he had used due diligence in his efforts to collect his debt from the Richmond government. And in considering the measure of diligence which he ought to have used, it must be borne in mind that the Richmond government was a revolutionary government, not recognized as lawful, and whose very existence was involved in the war then pending. He seems to have been diligent in importuning the officers of the penitentiary for payment up to the end of 1862. He does not appear to have done anything in 1863 or 1864. The next thing he seems to have done was on the 27th day of January, 1865, when he obtained a certified copy of his account from the books of. the penitentiary, and a certificate from the superintendent of his refusal to pay the claim, and of the ground of his refusal. These were obtained, no doubt, with a view to the application *418 to the Legislature, spoken of by Judge Skeffey. Why was no legal proceeding taken in all this time? Why was no application made to the Legislature at the session of 1862-’3, or at that of 1863-’4? Why was it postponed until 1865, when, as the Legislature no doubt well knew, the Confederate cause had come to extremities well nigh desperate—utterly desperate, as the event soon proved—and when the minds of members were so engrossed by the perils of the situation that no wonder they could give but little attention to claims ? My opinion is, that Chalkley has not shown that he used due diligence to collect his claim from the Eickmond government.
IJpon the whole, I am of opinion that the claim of Chalkley cannot be sustained upon any ground of law or equity. The decree must, therefore, be reversed and the petition dismissed.
Anderson, J. I very reluctantly, and with considerable doubt, concur in the judgment, upon the ground of the inhibition of the constitution. But am not prepared to concur in all the positions and the reasoning of the opinion of J. Joynes.
The other judges concurred in the opinion of Joynes, J.
Judgment reversed.